## 65982. BANK OF DANIELSVILLE v. SEAGRAVES.
## 65983. SEAGRAVES v. HARTFORD ACCIDENT & INDEMNITY COMPANY.

QUILLIAN, Presiding Judge.

The Bank of Danielsville, third-party defendant, appeals from the grant of summary judgment to Erma Sue Seagraves — the third-party plaintiff and defendant. Seagraves appeals from the grant of summary judgment to the plaintiff — Hartford Accident and Indemnity Company. In 1976, Seagraves, then the head cashier for the Bank of Danielsville (Bank), received approval by the Bank of a loan in the amount of $8,000. There was no collateral and the loan was to be evidenced by two $4,000 promissory notes — signed by her and her husband Cecil Seagraves, and the notes were to be co-signed by her husband's uncle — Dewey Seagraves. Originally, Dewey Seagraves advised the Bank he would co-sign the notes but then he changed his mind and told the president — Richard Huff, that he would not co-sign them. Thereafter, Sue Seagraves told Huff that she was going to get "those notes straightened out." He said "okay." Sue Seagraves stated that Dewey Seagraves came to the Bank several times to co-sign the notes but they were not ready. She made out two $4,000 promissory notes dated July 31, 1976, which were identical to those made out by the Bank except for the dates, and she and her husband signed them. She said that Dewey Seagraves would come by the Bank to co-sign them. Huff admitted that some preferred customers did call the Bank for a loan in the amount of several hundred dollars for someone else, and then would come by the Bank and sign the note, but there was a difference between an employee doing this and a customer.

Seagraves removed $8,000 from her "money pouch" and inserted the notes. On July 31, 1976, she gave the two notes to Tommy Lackey, another bank employee, who was to enter them in the Bank's

loan register. On Monday morning, August 2, 1976, Seagraves went on two weeks vacation. Dewey Seagraves did not come by the Bank to sign the notes. Lackey gave the notes to Huff on August 2 and no further action was taken until Seagraves returned to work on August 16. Huff asked her for an explanation. She told him that Dewey Seagraves was going to sign them. Huff said that he "temporarily terminated" her pending a director's meeting. Seagraves said she was fired. On September 13, 1976, Huff stated in a letter to Hartford that Seagraves was terminated "the day she returned from her two weeks vacation."

Sue Seagraves said that after she was fired she brought Dewey Seagraves to the Bank that same day and they spoke to Huff. Huff stated that Dewey Seagraves asked him: ". . . if I did sign the note would that assure Sue of her job? I said, Mr. Seagraves, I can't tell you for sure, but I cannot guarantee that." Dewey Seagraves refused to sign the notes under those circumstances. A meeting of the Bank directors was held the following day and the firing of Sue Seagraves was affirmed.

The Bank submitted a claim under its fidelity bond with Hartford Accident and Indemnity Company for $8,000. On September 7, 1976, Huff submitted a Proof of Loss to Hartford in which he claimed the "Bank of Danielsville suffered a loss: in the amount of $8,000" — referring to the two $4,000 promissory notes. Hartford returned the Proof of Loss and attached a "proper Proof of Loss for filing a claim in which dishonesty of an employee is asserted and made the basis of a claim being filed." Thereafter, Huff, signing as president of the Bank, on September 28, 1976, submitted a claim to Hartford in which he alleged the Bank "suffered loss through the dishonesty of Mrs. Erma Sue Seagraves . . . and that the amount of money dishonestly misappropriated . . . amounts to . . . $8,000 . . . the manner in which this money was misappropriated is as follows: Eight Thousand Dollars removed from cash pouch without any approved documents to substantiate." Hartford paid the Bank $7,500 — subtracting the $500 deductible under the policy, and took a "Release and Assignment" from the Bank on November 1, 1976, in which it was stated that the Bank "has assigned and does hereby assign, sell, transfer and set over to the Surety all its right, title and interest in relation to any and all items claimed in and by the said Proof of Loss, and all money that may be recovered by reason thereof."

The material facts of this case are extensive and convoluted, but it should be noted at this point that the two negotiable promissory notes executed by Seagraves were not referred to in the Proof of Loss, and the Bank kept them in its possession and did not indorse or transfer them to Hartford — assignee of the right to take action

against the former Bank employee. However, it must also be noted that under the first Proof of Loss and correspondence between the Bank and Hartford, that Hartford was fully aware of the existence of the two promissory notes executed by Sue Seagraves and her husband.

On December 3, 1976, Sue Seagraves filed an action alleging libel and slander against Huff and the Bank, for stating that she dishonestly misappropriated $8,000 from the bank. The complaint specifically referred to Huff's affidavit to Hartford in which he claimed the Bank suffered the loss of $8,000 which had been "dishonestly misappropriated" by Seagraves. Following discovery and negotiations between attorneys for all parties, a consent order was issued by the trial court on October 5, 1978, in which the Bank paid Seagraves her Christmas bonus and two weeks severance pay, and she paid the Bank $3,800 "in total satisfaction of all claims the parties had or have against or among each other . . ." Seagraves had owed the Bank an amount of money on two prior loans.

The attorney for the Bank admitted that in the consent agreement it was "[o]ur intent, to dispose of all matters" and that included "any claim the bank had on those [two $4,000] notes." Counsel for Sue Seagraves asked the attorney for the Bank: "Q. Now it was your understanding and my understanding . . . while we were going through the negotiations, we were under the impression, you and I both were under the impression that we were disposing of these two notes with Sue Seagraves when we were finally disposing of that case; is that correct? A. That's right, between the parties. That's correct . . . In our discussions between the two of us, as well as Judge Burrows, we stated to him that we were concluding all claims that the parties had against each other for whatever claim they might have. That's right . . . Q. And you and I, as far as we were concerned, were disposing of the $8,000 represented by the two notes, the $3,000 that she was supposed to give the bank, and I think it was somewhere around $1,200 that the bank was giving her? A. We disposed of all claims, that's correct . . . Those notes, the other notes that she and Cecil had executed, her claim for libel by Mr. Huff, her claim for vacation or Christmas bonus pay. Every claim the bank had against her and she had against the bank was disposed of at that point. And those notes were discussed in that light, yes."

After the settlement of Seagraves' libel action against Huff and the Bank on October 5, 1978, on March 22, 1979, an attorney representing Hartford wrote Huff: "My client has not actively sought pursuit of its recovery under the bond claim against the principal, Mrs. Seagraves, so as not to in any way prejudice, or otherwise adversely affect the defendants (Richard Palmer Huff and Bank of

Danielsville) in Civil Action No. 75353, Superior Court of Madison County. However, we understand that that case has been settled between the parties, and we have a copy of the consent order entered into October 5, 1978 . . . Are the promissory notes executed by Mrs. Seagraves, which formed the basis of the bond claim, still in existence and held by the bank, or have they been cancelled or modified in light of the above consent order?" The attorney for the Bank responded: "The promissory notes executed by Mrs. Seagraves are still in existence and held by the Bank and have not been cancelled or modified in light of the consent order." In a subsequent letter, the same attorney wrote the attorney for Hartford: "The $3,800 payment by Mrs. Seagraves to the Bank of Danielsville was not in reduction or settlement of the promissory notes of which the bond claim payment by Hartford to the Bank was made. This $3,800 covered other notes which Mrs. Seagraves and her husband, Cecil Seagraves had executed." Following this exchange of letters, Hartford, on May 1, 1979, "requests that the promissory note [sic] be assigned and transferred to it for the purposes of pursuit of the principal or, in the alternative, that the Bank of Danielsville pursue collection of these notes for the benefit of The Hartford . . . Company."

On November 1, 1979 (3 years to the day after the Bank's first assignment to Hartford), Huff — as president of the Bank, executed an "Affidavit and Assignment of Promissory Notes" to Hartford in which it was stated that the Bank "does hereby transfer and assign the notes described . . . to HARTFORD . . ." Huff stated that "[b]oth notes (Exhibits A & B) are now due and payable to the Bank of Danielsville . . . or to their transferees and assigns . . . The Bank of Danielsville . . . has received no other consideration as payment or settlement of said notes." Prior to that, in the same affidavit, the Bank had stated that Sue Seagraves "presently owes all unpaid installments on said instruments, which she has failed and refused to pay, although duly demanded by the Bank of Danielsville. . ."

On November 3, 1979, Hartford filed this action against Sue Seagraves on the two promissory notes, alleging that they had been transferred and assigned by the Bank to them for value received. Defendant Seagraves answered alleging there had been an accord and satisfaction of the two notes and that plaintiff's assignor, the Bank, had consented to an order by the court discharging the same two notes. Hartford amended its complaint to allege that the Bank had transferred all of its right to the note to it under the earlier Release and Assignment, and by reason of contractual language in the fidelity bond it was the assignee. Seagraves then amended her answer and filed a third-party complaint against the Bank alleging that the Bank intentionally and maliciously inflicted harm upon her by assigning

the notes to plaintiff with full knowledge that the debt evidenced by the notes had been released and satisfied by the Consent Order entered into between the parties on October 5, 1978. The Bank's answer alleged that the claim raised by Seagraves in its third-party complaint had been "necessarily determined" by the Consent Order of October 5 and that the Bank was fully released from all claims of Sue Seagraves.

Hartford and Seagraves moved for summary judgment against each other. The court granted Hartford's motion and denied Seagraves' motion. Thereafter, Seagraves filed for summary judgment against the Bank and it was granted. Seagraves appeals the grant of summary judgment to Hartford and the Bank appeals the grant of summary judgment to Seagraves. *Held:*

Hartford based its claim for summary judgment against Seagraves on two theories: (1) assignment of the two promissory notes, and (2) equitable subrogation. We cannot agree with either theory. At the outset we should note that the two promissory notes which form the bases for this action were negotiable instruments. See Code Ann. § 109A-3—104 (OCGA § 11-3-104). There are two methods for transfer of negotiable instruments — negotiation and assignment. 2 Anderson UCC 751, § 3-201:3. However, "[o]nly a negotiation, not an assignment, can constitute a transferee a 'holder' of a negotiable instrument." 11 AmJur2d 337, Bills & Notes, § 312. "Negotiation is the transfer of an instrument in such form that the transferee becomes a holder. If the instrument is payable to order it is negotiated by delivery with any necessary indorsement; if payable to bearer it is negotiated by delivery." Code Ann. § 109A-3—202(1) (OCGA § 11-3-202(1)). The notes in the instant case were made payable to the order of the Bank, and thereafter to the "holder." They were neither indorsed nor transferred. Negotiation "takes effect only when the indorsement is made . . ." Code Ann. § 109A-3—201 (3) (OCGA § 11-3-201 (3)). In addition, "[d]elivery is an essential element of negotiation in the case of order paper." 2 Anderson UCC 773, § 3-202:33. Delivery can be actual or constructive. Where there is no actual delivery, constructive delivery may be sufficient where there is delivery of a written assignment without delivery of the negotiable instrument — where it is the clear intent of the parties to effect such delivery and to transfer title to the negotiable instrument. 2 Anderson UCC 775, § 3-202:38. The assignment in the instant case on November 1, 1976 made no reference to the promissory notes, and there was no indorsement and no delivery of the notes to the purported transferee. The intent of the parties to effect such delivery and to transfer title was made clear on November 1, 1979 when the Bank actually

assigned these notes to Hartford. We find there was no "negotiation" of the notes.

Was there an effective assignment of the notes prior to November 1, 1979? Assignment of a note means transfer of the title to the instrument so that the recipient may bring an action thereon. *Haug v. Riley,* 101 Ga. 372 (2) (29 SE 44); *McLanahan v. Keith,* 135 Ga. App. 117, 119 (217 SE2d 420); 11 AmJur2d 338, Bills & Notes, § 313. As noted above, the so called assignment on November 1, 1976 made no mention of the promissory notes and there was no delivery of the notes — either actually or constructively. The subsequent "assignment" of the notes on November 1, 1979, was subject to the prior knowledge of Hartford that the two notes had been involved in the action between the Bank and Seagraves and the assignee takes only such title or rights as his assignor had — subject to all defenses available against his assignor. 11 AmJur2d 338, 396, Bills & Notes, §§ 313, 373. Hartford was aware of the action and knew that it did not have possession of the notes and when they received a copy of the "consent" order between the parties advised the Bank that they had knowingly refused to enter into any action against Seagraves regarding the notes because of the pending action against Huff and the Bank. Accordingly, we find no effective assignment of the legal title to these notes prior to November 1, 1979. See *Tallahassee Bank & Trust Co. v. Raines,* 125 Ga. App. 263 (1) (187 SE2d 320); 2 EGL 371, Assignment, § 5.

Hartford claims that it became subrogated to the rights of the Bank as to these notes. " 'Subrogation is the substitution of another person in the place of the creditor, so that the person in whose favor it is exercised succeeds to all the rights of the creditor. It is of equitable origin, being founded upon the dictates of refined justice, and its basis is the doing of complete, essential, and perfect justice between the parties, and its object is the prevention of injustice . . . Legal subrogation takes place as a matter of equity, without any agreement to that effect made with the person paying the debt, and is independent of both creditor and debtor.' " *Southern R. Co. v. Overnite Transp. Co.,* 223 Ga. 825, 830 (6) (158 SE2d 387). "A surety who has paid the debt of his principal shall be subrogated, both at law and in equity, *to all the rights* of the creditor . . ." (Emphasis supplied.) Code Ann. § 103-501 (Code § 103-501; OCGA § 10-7-56). Hence, legal subrogation arises as a matter of equity without any agreement to that effect, and conventional subrogation depends upon contract, and upon payment of the debt of another one is entitled to the securities and rights of the creditor so paid. *Wilkins, Neely & Jones v. Gibson,* 113 Ga. 31, 42 (38 SE 374); see also *Davis v. Johnson,* 241 Ga. 436, 439 (246 SE2d 297); see also *Fireman's Fund Ins. Co. v.*

*Thomas,* 49 Ga. App. 731, 734-735 (176 SE 690).

Under the fidelity bond issued by Hartford to the Bank, it was agreed that "upon payment to the Insured by the Underwriter on account of any loss through fraudulent or dishonest acts committed by any of the . . . employees . . . an assignment of such of the Insured's rights and causes of action as it may have against such Processor by reason of such acts so committed shall, to the extent of such payment, be given by the Insured to the Underwriter and the Insured shall execute all papers necessary to secure to the Underwriter the rights herein provided for."

Thus, if Hartford claims conventional subrogation existed they would have to rely upon this assignment by the insured of the particular right they seek to enforce. Under the Code and the bond, Hartford was to be subrogated "to all the rights" (or "the rights") of the creditor. As we have stated above, there was no "assignment" of the legal title to the two notes prior to November 1, 1979, even though Hartford may have been entitled to "the rights" of the creditor who was holding those notes.

If Hartford seeks to claim equitable subrogation then it must satisfy the equitable maxims that he who would have equity must do equity, and give effect to all equitable rights of the other party involving the subject matter (Code Ann. § 37-104; OCGA § 23-1-10), and that where one of two innocent parties must suffer by the act of a third person, he who put it in the power of the third person to inflict the injury shall bear the loss (Code Ann. § 37-113; OCGA § 23-1-14). In the case sub judice Seagraves executed and delivered to the Bank as payee, two promissory notes. Hartford paid a fidelity claim based on the actions of Seagraves and took an assignment from the Bank for the *right* to pursue the principal. Hartford knew of the existence of the notes and was aware that it did not have them. The letter from the attorney of ˋHartford on March 22, 1979 recited Hartford's forbearance from pursuing recovery on the notes "so as not to in any way prejudice, or otherwise adversely affect, the defendants (Richard Palmer Huff and Bank of Danielsville)" in the libel action by Seagraves. Hence, Hartford was fully aware that they did not possess the notes and that Seagraves was suing the Bank and its president and consciously delayed obtaining the notes so as not to prejudice the Bank — thus permitting the Bank to have possession of the notes which were involved in the Consent Order of October 5, 1978.

It has long been the law in Georgia that when there are but two parties to a promissory note, the maker and payee, "so long as the note remains in the hands of the payee the idea of indorsement is excluded. [Cits.]" *Willoughby v. Newman,* 46 Ga. App. 377 (167 SE 783). Accord, *Bomar v. Equitable Mortgage Co.,* 111 Ga. 143 (36 SE

601); *Evans v. Luce,* 190 Ga. 403 (2) (9 SE2d 646); *State of Ga. v. Industrial Acceptance Corp.,* 37 Ga. App. 253 (1) (139 SE 577); see in particular *Posey v. Frost Motor Co.,* 84 Ga. App. 30, 35 (65 SE2d 427). Hence, it was Hartford's knowing and voluntary act which permitted the Bank to possess the notes from Seagraves at the time of the Consent Order. If there was not an actual accord and satisfaction, the court and counsel for Seagraves were misled to their prejudice by the fact that the Bank possessed the notes, was the payee, and there was no evidence that they had been indorsed or assigned, and counsel for the Bank discussed the general release as if the notes were included in the accord and satisfaction. Counsel for the Bank was asked by counsel for Seagraves: "Q. And the cancellation of these [two $4,000] notes was instrumental in settlement of that lawsuit? A. I think the cancellation to [Sue Seagraves] claim against Mr. Huff and the bank, in consideration, the bank not pursuing these notes themselves, yes. Q. So then the bank received consideration for cancellation of those notes? A. Well, I — yeah, I would say that's correct."

Accordingly, in summary — the Bank was payee of the notes and was in possession of them. The Bank's attorney included the notes in the negotiations with Seagraves for cancellation of Seagraves' action against the Bank and "received consideration for cancellation of these notes . . ." Hartford knew that it was the assignee of the Bank's right of action, and under the fidelity bond had the right to request assignment of the Seagraves' notes from the Bank to perfect its claim against Seagraves. Additionally, Hartford was fully aware of Seagraves' action against the Bank and did not pursue its remedies or request assignment of the notes to them by the Bank "so as not to in any way prejudice, or otherwise adversely affect" the Bank. Thus, Hartford's knowing refusal to perfect or pursue its complete remedy, and its cooperation with the Bank, made it possible for the Bank to reach an accord and satisfaction with Seagraves which included the libel action, the notes, and all other claims by the Bank and Seagraves against each other.

Equity will grant relief only where there is no available, adequate, and complete remedy at law. *Waller v. Conner,* 218 Ga. 633, 635 (129 SE2d 845); accord: *Colston v. Hutchinson,* 208 Ga. 559 (67 SE2d 763); *Lively v. Grinstead,* 210 Ga. 361 (2) (80 SE2d 316); *Spruill v. Dominy,* 212 Ga. 145 (2) (91 SE2d 43). In the instant case, the original contract between Hartford and the Bank provided Hartford with an available, adequate, and complete remedy at law — assignment. Hartford knowingly chose not to pursue it. Resort to an equitable remedy is not available where the party knowingly refuses to avail itself of its complete legal remedy. *Firemen's Ins. Co. v. Ga. Power Co.,* 181 Ga. 621 (183 SE 799); *State Farm &c. Ins. Co. v. Five*

*Transp. Co.,* 246 Ga. 447, 454 (271 SE2d 844); *Fireman's Fund Ins. Co. v. Thomas,* 49 Ga. App. 731, 734-735, supra; *Allstate Ins. Co. v. Austin,* 120 Ga. App. 430, 433 (170 SE2d 840).

We find under the factual circumstances of this case, that there was no basis for equitable subrogation to Hartford of the legal title to these notes, nor was there an effective assignment of those notes in the initial Release and Assignment, dated November 1, 1976. The Bank had legal title to the undelivered, unindorsed, promissory notes it possessed as payee on October 5, 1978, and those notes were included in the consent order and discharged in the settlement of Seagraves' action against the Bank and Huff. Thereafter, Hartford, as assignee, took only such rights as its assignor possessed on November 1, 1979, and took the notes subject to the defenses available to the maker.

Summary judgment for Hartford was not authorized by law and must be reversed. As Seagraves is not now indebted to Hartford — on the basis of these notes, judgment over against the Bank is also unauthorized and must be reversed.

*Judgments reversed. Pope, J., concurs. Sognier, J., concurs in the judgment only.*

DECIDED MAY 18, 1983 —
REHEARING DENIED JUNE 27, 1983 —

*Edwin Fortson,* for appellant (case no. 65982).
*Jefferson W. Willis, J. Vincent Cook,* for appellee.
*J. Vincent Cook,* for appellant (case no. 65983).
*Edwin Fortson, Jefferson W. Willis,* for appellee.